**RANDOM HOUSE, INC., Plaintiff,**

**v.**

**Herbert GOLD, Defendant.**

**No. 77 Civ. 4642(MP).**

United States District Court,
S. D. New York.

Feb. 15, 1979.

Satterlee & Stephens, New York City, for plaintiff by J. Gregory Saver, New York City.

Bernard Petrie, San Francisco, Cal., for defendant.

## OPINION AND DECISION

POLLACK, District Judge.

This is an action to recover sums paid to the defendant as advances under a contract for the publication of up to four books to be written by defendant. Defendant has counter-claimed, alleging a breach of the contract in bad faith. The case was tried to the Bench on November 27 and 28, 1978.

Jurisdiction of this action is based on the diversity of citizenship of the parties. 28 U.S.C. § 1332. The plaintiff, Random House, Inc., is a New York corporation, and the defendant, Herbert Gold, is a citizen and resident of California.

### I.

In 1970, Random House and Gold entered into an agreement dated September 17, 1970, which called for the publication of four literary works to be written by Gold with an option to cancel the fourth book. The contract was drawn on a printed form customarily used for arrangements pertaining to a single book. The form was adapted by Random House to cover the proposed books involved herein.

Prior to the execution of the 1970 agreement, Random House had published several other works by Gold, including two books published pursuant to a 1965 contract. The latter two books were quite successful, and Gold received advances and royalties from them in excess of $100,000.

The 1970 agreement provided for the payment of advances of $150,000, payable to Gold in ten equal annual installments. The advances were against and on account of all moneys accruing to Gold under the agreement. The contract required Gold to submit manuscripts for the works "in content and form satisfactory to the publisher" and in accordance with a delivery schedule set forth therein.

The 1970 contract also provided that Gold had the right to terminate the agreement with respect to a fourth work if he had earned $150,000 or more from the publication of works # 1, 2 and 3. Gold also gave Random House an option to publish any other books he wrote during the term of the contract as well as the first book thereafter.

Gold wrote and delivered the first two works and Random House accepted and published them. In January 1973, Random House paid Gold the fourth installment of the agreed advances, making a total of $60,000 thereon to that date. As of December 1973, Gold's royalties on the two published works totaled $9,304.71.

On July 30, 1973, James Brown, Gold's literary agent, delivered the manuscript of the third work, a novel entitled *Swiftie the Magician*. James Silberman, the editor-in-chief at Random House, read the manuscript and also asked another fiction editor, Joe Fox, to read it. Silberman also asked his staff to check on the financial results of the Gold contract. His secretary reported to him that Random House had paid a total of $60,000 and that the two published books had earned a total of $11,579.35, as of March 31, 1973.

Fox reported to Silberman on August 23, 1973. He admitted he was not a fan of Gold's work, and criticized the manuscript

as shallow and badly designed. In considering whether Random House should agree to publish the book, Fox asked whether Random House was behind financially on the contract with Gold.

On September 11, 1973, Silberman sent some of Fox's comments to Gold, with a covering letter stating that he was "uneasy" about the manuscript. Gold went to work on a revision of the manuscript.

On December 20, 1973, just ten days before another installment of the agreed advances would have fallen due and after being assured by Random House's attorneys that in their opinion Gold would have to repay about $50,000 if the contract were terminated, Silberman wrote to Brown, stating that the manuscript was unsatisfactory in form and content and that Random House was terminating the agreement pursuant to Paragraph 2 thereof. Silberman testified that he decided to reject the book after reading a second, revised manuscript. He did not give the second manuscript to Fox or to anyone else to read. He could not remember exactly why he thought that the work was not a good book, and he did not keep a written memorandum of his criticisms, but said that they were the same as those in the Fox memo. Silberman admitted that he was conscious of the financial circumstances of the Gold contract at the time he decided to reject the book.

On January 2, 1974, Silberman and Brown spoke over the telephone about the third work by Gold. Silberman offered to renegotiate the terms of the Gold contract, and told Brown that the manuscript for the third work would be acceptable to Random House on different terms.

After the rejection by Random House, Brown offered the Gold manuscript for *Swiftie the Magician* to McGraw-Hill, which accepted the work for publication and paid Gold an advance of $10,000.

## II.

Random House now seeks to recover from Gold the amount of all the advances paid to Gold in excess of the royalties accrued with respect to the two published works, or approximately $50,000. It contends that the sum represents an "unearned" advance which Gold agreed to repay in the event the contract was terminated.

Gold denies that he is obligated to repay all the advances he had received, viz., the $60,000 (less accrued royalties) and maintains that he is entitled to the $90,000 balance of the agreed advances because Random House breached the agreement in bad faith. Gold argues that he is at least entitled to an additional $15,000 for that part of the agreed advances attributable to the two works accepted and published by Random House.

The positions of the parties present three questions to be decided in the resolution of this case. First, whether Random House breached its contract with Gold or was privileged to terminate the agreement upon rejection by it of the third work; second, whether Gold must repay some or all of the advances paid to him; and third, whether Random House is liable for some or all of the unpaid balance of the $150,000 of the agreed advances.

## A.

Gold contends that Random House acted in bad faith when it rejected the *Swiftie* manuscript because it gave undue and improper weight to financial considerations in the making of that decision and to escaping from the remaining financial obligations if it rejected the third work. Gold points to the plaintiff's offer to accept and publish the third work on different terms. Gold has offered no authority, however, for the proposition that a publisher's financial circumstances and the likelihood of a book's commercial success must be excluded from the range of factors that may be weighed in the decision to accept or reject a manuscript offered for publication, and this Court declines to endorse such a view. The requirement that a manuscript be satisfactory to the publisher gives it the right to reject a work if it acts in good faith; the publisher is not bound to incur the significant costs of publication if it declines to accept the risk of financial loss.[1] There has been no other

---

1. This view may permit overreaching by publishers attempting to extricate themselves from bad deals, as has arguably occurred in the instant case. As will be seen *infra*, the multi-

suggestion that Random House's view of the manuscript as unsatisfactory from its viewpoint was not held honestly and in good faith, and Gold's claim of a breach of contract in bad faith has not been established by a preponderance of the credible evidence.

■ Once it had determined that Gold's manuscript failed to meet the conditions of the contract, Random House had the right to terminate the agreement in part, pursuant to paragraph "2":

> If the Author fails to deliver any manuscript within ninety (90) days after the above dates respectively, for reasons other than mental or physical incapacitation, as to any undelivered works, Publisher may terminate this agreement by giving written notice. . . .

Random House terminated the contract as to works # 3 and # 4 by letter on December 20, 1973, and is not liable for a breach of contract as to those "undelivered works." The nature and scope of Random House's obligations as to the two previously published works are discussed *infra*.

### B.

Random House seeks to recover the entire amount of the advances paid to Gold, less the sum of royalties accrued on the published works. Random House's claim for repayment, however, lacks any support in the express language of the agreement of the parties.

Paragraph "2" of the contract states that, "*as to any undelivered works,*" (emphasis added):

> . . . the Author agrees to repay forthwith all unearned amounts which may have been advanced hereunder, and Publisher will not be liable for any further advance installments.

■ Similarly, with respect to repayment of moneys advanced on published works, paragraph "9" of the contract states in harmony with the foregoing quotation from paragraph "2" that:

book contract in this case only allowed the publisher to avoid further losses as to future books; it did not permit the publisher to shift

> Any such advance shall not be repayable, provided that the Author has delivered the manuscript in conformity with Paragraph 2 and is not otherwise in default under this agreement.

The quoted sentence from paragraph "9" refers to "*the* manuscript" rather than to *all four* manuscripts, and in the face of the express limitation on recovery of advances to "any undelivered works," the manuscript referred to in the proviso of paragraph "9" must be interpreted to distinguish delivered from undelivered works. This is cogent evidence that paragraphs "9" and "2" must be interpreted as applying independently to each of the four contemplated manuscripts. Thus, since Gold delivered the first two manuscripts in conformity with paragraph "2", advances attributable to those manuscripts are not repayable.

The evidence as a whole makes clear that, in effect, the parties made four separable arrangements in the adapted printed form, one for each work.

■ The notion of the plaintiff that the contract which it drew (adapted) is to be read as providing for a forfeiture by the defendant of all the advances it had received over a four year period because the plaintiff decided not to publish the third work, does violence to the contract, common sense and industry practice. Plaintiff's vice-president and editor-in-chief, Mr. Silberman testified that where separate works have been contracted for, an allocation is to be made of advances to each of the several works involved and that such an arrangement is common in the publishing industry. Moreover, when used in such a contract "all moneys earned" applies to each of the several works separately.

There is no doubt that the parties intended that their paper writing should be viewed as four single book contracts. In the plaintiff's instructions to its draftsman he was told to prepare a "Limitation of payments: $25,000 for *all* contracts" (em-

the entire burden of unsuccessful published books to the author.

phasis added) (Exh. "F"). Moreover the parties understood and the typed-in modification of the printed form confirms that the arrangement could be for "three books, not four" (Exh. "O"). Work #4 was a provisional addition to be supplied only if the Author has not earned $150,000 or more on works #1, #2, and #3, taken together and has not therefore exercised his "right to terminate this agreement with respect to the 4th work." (See typed-in additions to paragraphs "2" and "25" of Exhibit 1).

The multiple character of most of the contractual arrangement on Exhibit "1", which was a printed form of contract, printed to deal with a single book is evidenced further by the expansion of the "Whereas" clause from the single work to four works and the many printed clauses which continued to refer to the separable works here involved as "the work," e. g., ¶¶ 1(a)(i)(ii)(iv)(ix); 1(d); 2; 3; 4(a)(b); 5; 6; 7; 8; 11; 16; and 18. In ¶9 the agreement permits the publisher to suspend installment payments if the author becomes physically or mentally incapacitated prior to delivery of "all" the works, a suspension for the duration of the disability. But then, this paragraph continues that any advance "shall not be repayable, provided that the Author has delivered the manuscript in conformity with paragraph 2". The defendant did deliver the manuscript of works #1 and #2 in conformity with paragraph "2".

Mr. Silberman admitted to defendant that unearned advances to authors by publishers are common and that it would be expected to give Gold, the defendant, at least $60,000 advance for two works, accepted and published. (See Exhibit "U").

The defendant Gold received $60,000 advanced against the possibility of four works. He failed to deliver the third manuscript in satisfactory form and the contract was terminated as to the third and fourth works. As to those "undelivered works," Gold must repay the portion of his advance attributable to them, or $30,000, which was not earned by the timely delivery of a satisfactory manuscript. Gold's promise to repay advances did not extend to delivered, accepted and published works, however, and Gold may retain the $30,000 attributable to the two published books.

### C.

Random House contends that it was not obligated to continue to pay any part of the advances due in the years 1974 through 1979. This contention, however, is also without support in the terms of the contract.

The *only* circumstance in which Random House was permitted to suspend all advance payments, notwithstanding its acceptance and publication of one or more of the four works was the disability of the author. Paragraph "9" states in part:

> If the Author becomes physically or mentally incapacitated prior to delivery of *all the Works,* Publisher may discontinue payments of installments and will have no further obligation to make such payments for the duration of the disability. (Emphasis added.)

In this provision of paragraph "9", the rights and obligations of the publisher are clearly expressed: it may suspend all advance payments even where, for example, a disability delays delivery of a fourth manuscript after three works have been delivered and published. In contrast, there is no similar provision in the contract allowing Random House to suspend *all* payments when the contract is terminated *in part* as to undelivered works.

Paragraph "2", on which Random House relies, grants the publisher only partial relief from the continuing obligation to make advance payments. It provides:

> If the Author fails to deliver any manuscript . . . , as to any undelivered works, . . . Publisher will not be liable for any further advance installments.

Conversely, as to delivered and published works, Random House remains liable for further advance installments after a partial termination of the contract.

Therefore, with respect to the six advances due for the years 1974 through 1979, Random House is not liable for those attrib-

utable to the two "undelivered works," but Random House is liable for the portion of those installments attributable to the delivered and published books, or $45,000.

### III.

Accordingly, the further findings and conclusions of this Court are as follows:

(1) Random House rejected the manuscript for *Swiftie the Magician,* the 3rd work, as unsatisfactory in form and content in good faith, and was privileged to terminate the 1970 agreement as to the third and fourth works, the undelivered works.

(2) Random House is entitled to recover from Gold the advances paid as to the undelivered works, or $30,000.

(3) Random House is *not* entitled to recover from Gold the advances paid as to the two published books.

(4) Gold is *not* entitled to recover from Random House the unpaid advances attributable to the undelivered works.

(5) Gold is entitled to recover from Random House the unpaid advances attributable to the two published books, or $45,000.

(6) Therefore, Gold is entitled to recover from Random House the net amount of $15,000, plus interest and costs, and the Clerk is directed to enter judgment accordingly.

The foregoing shall constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

SO ORDERED.