**John J. NANCE, Plaintiff,**

v.

**RANDOM HOUSE, INC. d/b/a Bantam Doubleday Dell Publishing Group, and St. Martin's Press, Incorporated, Defendants.**

**No. 00 Civ. 8639(SHS).**

United States District Court, S.D. New York.

July 30, 2002.

---

Russell A. Smith, The Law Offices of Russell Alexander Smith, PC, New York City, for John J. Nance, Plaintiff.

Victor A. Kovner, Davis Wright Tremaine LLP, New York City, for Random House, Inc., St. Martins Press, Incorporated, Defendants.

Victor A. Kovner, Davis Wright Tremaine LLP, New York City, for Random House, Inc., St. Martins Press Incorporated, Counter–Claimants.

Russell A. Smith, The Law Offices of Russell Alexander Smith, PC, New York City, for John J. Nance, Counter–Defendant.

## OPINION

STEIN, District Judge.

John J. Nance, a successful author of action novels, brings this breach of contract action against Bantam Doubleday Dell Publishing Group ("Doubleday")[1] and

---

1. In 1998, Bantam Doubleday Dell Publishing Group, Inc. merged with Random House, Inc.   (Coyne Aff. ¶ 1, n. 2.)

St. Martin's Press, Inc. Jurisdiction exists in this Court because the controversy is between citizens of different states. *See* 28 U.S.C. § 1332. Nance alleges that defendants rejected his manuscript for a work of fiction in bad faith and fraudulently induced him to write an additional draft of the work that they never intended to publish. The publishers have moved for summary judgment dismissing the complaint and granting them summary judgment on their counterclaim for the return of the advances they paid to Nance prior to terminating his contract. Since the parties' contract required that Nance's manuscript be satisfactory to the publishers and Nance has failed to come forward with any issues of material fact that would establish that the publishers rejected the manuscript in bad faith, both of defendants' motions are granted.

## I. BACKGROUND

Nance is a commercial air pilot and author of eight novels, all of which are aviation-based thrillers. Prior to entering into the contract at issue in this action, Doubleday published the hardcover edition, and St. Martin's published the paperback edition, of Nance's novels *Pandora's Clock*—a *New York Times* bestseller—and *Medusa's Child*. In February 1997, Nance signed a contract (the "Contract") with Doubleday and St. Martin's for the publication of three additional novels over a three-year period. (Compl. ¶ 9; Coyne Aff. ¶ 3, Ex. 1.) The Contract stated that Nance would receive $1 million per book, with payments to be made first, upon signing the Contract; second, upon the completion of specified outlines and manuscripts "complete and satisfactory to [the] Publisher;" and third, upon publication of each novel. (Coyne Aff., Ex. 1, cl. 3, 7.) With respect to the editorial process, the Contract provided that the parties would agree on a schedule for revising submitted work, but that "[s]hould Publisher conclude that the Work or any portion thereof as first submitted cannot be revised to its satisfaction within a timely period or should Publisher find the revised Work or any portion thereof unacceptable for any reason, Publisher may reject it." (*Id.,* cl. 3(b).)

The first novel foreseen in the three-book Contract, *The Last Hostage,* was published in the spring of 1998. (Compl. ¶ 13.) Nance's literary agent Olga Wieser submitted an outline for the second work, entitled *Blackout,* on January 6, 1998. (Coyne Aff. ¶ 12, Ex. 2; Nance Dep. (I) at 77–78.) As described in the outline, *Blackout's* plot involved a commercial air flight whose pilot is blinded by a mysterious laser and forced to land the plane with the help of his terrified passengers. Shawn Coyne, a Senior Editor at Doubleday who had worked with Nance on *The Last Hostage,* sent Wieser comments the following day. (Coyne Aff. ¶ 12, Ex. 3; Nance Dep. (I) at 79–80). Nance sent a revised outline to Coyne and Matthew Shear, then Vice President and Publisher for St. Martin's, and subsequently met with Shear and Joseph Veltre, then an Assistant Editor at St. Martin's, to discuss the outline. (Coyne Aff. ¶¶ 13, 15, Ex. 4; Shear Dep. at 173; Veltre Dep. at 12–13; Nance Dep. (I) at 98.) In February, Nance submitted another revised outline, which the publishers accepted the following month and sent Nance an advance payment of $150,000 pursuant to the Contract. (Coyne Aff. ¶ 16, Ex. 7; Nance Dep. (I) at 101–02, 228.)

Nance then drafted a manuscript based on the approved outline and sent Coyne the first 17 chapters of *Blackout* in April. (Coyne Aff. ¶ 17, Ex. 9; Nance Dep. (I) at 119–120.) Coyne responded in writing that the manuscript was "coming along nicely" and shared some of his concerns with the submission, such as the need to

increase suspense by withholding certain plot details until later in the work. (Coyne Aff., Ex. 10.) Nance submitted the rest of the draft of *Blackout* in July. (Coyne Aff. ¶ 18; Compl. ¶ 23.) Coyne subsequently wrote Nance that while the manuscript had "a lot of great things going," some areas of the plot needed to be made more suspenseful or credible and that he intended to share the draft with the editors at St. Martin's before sending a more formal response. (Coyne Aff. ¶ 18, Ex. 11.)

The resulting comments were largely unfavorable. In an eight-page, single-spaced letter dated September 2, 1998, Coyne, Shear, and Veltre described specific problems with the plot, characterization and pacing of the manuscript. (Coyne Aff. ¶¶ 20–24, Ex. 13; Nance Dep. (I) at 155–56.) Most fundamentally, the editors felt that the submitted draft of *Blackout* lacked the elements that had made *Pandora's Clock* a bestseller—the combination of a "high concept plot," i.e., a single theme unifying the book, with a "very personal story." (Coyne Aff., Ex. 13 at 1–2.) While *Pandora's Clock* kept readers "glued to the page" with its story of a deadly virus transported on a plane, Nance's two subsequent novels—*Medusa's Child* and *The Last Hostage*—lacked the same narrative drive and thus sold fewer copies. The draft of *Blackout*, they believed, became bogged down in "the inner workings of the various strata of the American political, intelligence, and justice systems." (*Id.* at 2.) The editors invited Nance to provide them with a plan for revisions once he had identified "the missing big idea" that would appeal to his readers and "get [sales] back to the *Pandora* level." (*Id.* at 2, 8.)

The following week, Nance submitted a revised outline with a new "high concept"—a nuclear bomb hidden at the base of the Hoover Dam, the instructions for disarming which are contained on a computer diskette passed to an unwitting passenger on a flight from Hong Kong to Los Angeles. (Coyne Aff. ¶¶ 25–27, Ex. 14.) The device of a pilot blinded by lasers was retained, but it was reduced it to a subsidiary element to the main nuclear bomb story. The editors were unimpressed by Nance's changes and instead sent him their own suggested outline for *Blackout*. (Coyne Aff. ¶ 28, Ex. 15.) The letter also cautioned, "our acceptance of the [first *Blackout*] outline did not imply that we would accept the first draft of *Blackout*, which we have decided not to do. And, should you choose to follow our suggested revised outline . . . we'll still have to evaluate this next draft and determine its acceptability." In early November, Nance submitted another revised outline based on the editors' suggestions. (Coyne Aff. ¶ 29, Ex. 16.) Shortly thereafter, Coyne informed Wieser that Nance should draft a manuscript based on the revised outline. (Coyne Aff. ¶ 29.)

Nance submitted part of the second draft of *Blackout* on December 1, 1998, noting in his cover letter that he "absolutely must know immediately if there is anything in the evolving copy that does not fully meet the expectations of the approved outline." (Coyne Aff. ¶ 30, Ex. 17; Nance Dep. (I) at 230–31.) Coyne responded that the editors would be unable to evaluate the work until they had received the entire manuscript. (Coyne Aff. ¶ 31, Ex. 18, Nance Dep. (I) at 233.) By early January 1999, Nance had submitted the entire second draft of *Blackout*. (Coyne Aff. ¶ 32, Exs. 19–21; Nance Dep. (I) at 238–243.)

Unfortunately for Nance, the second *Blackout* manuscript fared no better in the judgment of the editors than the first. William Thomas, the Editor–in–Chief of Doubleday, formally terminated the Contract in a letter of February 8, 1999, writ-

ing that "[a]fter two rewrites the manuscript is editorially unacceptable and there is no likelihood that a further revision will solve the editorial problems," including the work's lack of suspense, "wooden" dialogue, "cartoon-like" characters, and "awkward" prose. (Coyne Aff. ¶ 38, Ex. 22.)

Shortly thereafter, Nance sold the second *Blackout* manuscript to publisher Penguin Putnam, Inc. for an advance of $550,000. (Nance Aff. ¶ 71.) Putnam published the hardcover edition of the novel in February 2000. Defendants then sought to recover the advances they had paid to Nance for *Blackout* and the unwritten third novel. Although the parties attempted to resolve their differences, and Nance voluntarily repaid $15,000 to defendants, settlement discussions ultimately broke down and Nance filed this action. (Kovner Aff. ¶ 9; Ex. 5, Nance Dep. (II) at 46–47, 52–53.)

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment may be granted "only when the moving party demonstrates that 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir.1995) (quoting Fed.R.Civ.P. 56(c)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor ... and may grant summary judgment only when 'no reasonable trier of fact could find in favor of the nonmoving party.'" *Allen*, 64 F.3d at 79 (quoting *Lund's, Inc. v. Chemical Bank*, 870 F.2d 840, 844 (2d Cir.1989)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the non-moving party must come forward with specific facts to show there is a factual question that must be resolved at trial. Fed. R.Civ.P. 56(e); *see also Velez v. Sebco Laundry Sys., Inc.*, 178 F.Supp.2d 336, 339 (S.D.N.Y.2001). A non-moving party must produce evidence in the record and may not rely on "conclusory allegations, speculation or conjecture." *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir.1996) In short, a non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### B. Breach of Contract

■ The Contract provided that Nance's manuscripts had to be "complete and satisfactory to [the] Publisher," and further stated that the publishers could reject a manuscript if they found it "unacceptable for any reason." (Coyne Aff., Ex. 1, cl. 7, 3(b).) Courts have interpreted such clauses to grant publishers wide discretion to terminate publishing contracts, "provided that the termination is made in good faith, and that the failure of the author to submit a satisfactory manuscript was not caused by the publisher's bad faith." *Doubleday & Co. v. Curtis*, 763 F.2d 495, 501 (2d Cir.1985). *See also Random House, Inc. v. Gold*, 464 F.Supp. 1306, 1308 (S.D.N.Y.), *aff'd*, 607 F.2d 998 (2d Cir.1979); *Random House, Inc. v. Curry*, 747 F.Supp. 191, 193 (S.D.N.Y. 1990); *Harcourt Brace Jovanovich, Inc. v. Goldwater*, 532 F.Supp. 619, 624 (S.D.N.Y. 1982). "Dishonesty" or "willful neglect" are evidence of bad faith. *See Curtis*, 763 F.2d at 501. In sum, the requirement that a work be "complete and satisfactory to [the] Publisher" gives the publisher the right to reject the work as long as it acts in good faith.

■ Nance contends that the publishers rejected *Blackout* not on its own merits but in response to the low sales figures for Nance's two previous books, *Medusa's Child* and *The Last Hostage.* Even assuming that the rejection of a manuscript based on poor sales of prior works constitutes bad faith—which is not clear, *see Gold,* 464 F.Supp. at 1308 (declining to hold that rejecting a book for financial reasons was bad faith)—Nance has failed to come forward, after extensive discovery in this action, with any evidence that defendants rejected his draft due to disappointing sales of his most recent novels. While the editors' letter of September 2, 1998 does refer to the relative sales performances of Nance's last three books, these remarks are made within the context of a detailed and lengthy editorial analysis of the shortcomings in the plot, characters and pacing of the submitted draft. To draw the inference from the September 2 letter that the publishers had already decided to reject *Blackout* because Nance's two prior novels had not sold enough copies is sheer conjecture and insufficient to withstand a summary judgment motion. *Cf. Curry,* 747 F.Supp. at 193.

Nor does anything else in the record support an inference of bad faith. Coyne's favorable comments about early versions of the outline and manuscript were coupled with detailed criticisms of the plot and characterization. Nowhere did Coyne represent that there were no problems with the manuscript or that publication was guaranteed, and the fact that he praised certain aspects of early drafts and outlines does not indicate an attempt to deceive or mislead Nance. *See Curtis,* 763 F.2d at 501, n. 4. Similarly, Nance's contention that the editors exhibited bad faith by rejecting a manuscript when they had previously approved its outline also fails, since the Contract clearly states that "[a]cceptance of the outline for a Work and payment of the portion of the advance due as a result thereof shall not, in any way, limit or restrict the Publisher's right to determine, following delivery of the complete manuscript of the Work, whether the complete manuscript is satisfactory." (Coyne Aff., Ex. 1, cl. 3(b).)

■ It is indisputable that the editors at Doubleday and St. Martin's spent considerable time and effort working with Nance on the *Blackout* manuscript. Indeed, the final version of *Blackout* that Nance eventually sold to Putnam was based on an outline written by the editors that differed significantly from Nance's original proposal. The case therefore differs from *Goldwater,* 532 F.Supp. at 624, and *Dell Publ'g Co. v. Whedon,* 577 F.Supp. 1459, 1462 (S.D.N.Y.1984), in which the publishers rejected works without giving the authors any editorial suggestions or opportunities for revision. Finally, Putnam's subsequent publication of *Blackout* is not evidence of defendants' bad faith, since it is well-established that evaluations of editorial acceptability are based on the subjective judgment of the publisher. *See, e.g., Gold,* 464 F.Supp. at 1308–09. What in good faith may be acceptable to one publisher may be, in equally good faith, not acceptable to a different publisher.

Because Nance has not raised any triable issue of fact that defendants rejected his manuscript in bad faith, the publishers' motion for summary judgment on Nance's claim for breach of contract is granted.

### C. Fraud

Nance alleges that defendants fraudulently induced him to make extensive revisions on the *Blackout* manuscript, when in fact they had no good faith intention of considering the manuscript at all due to the sales record of his previous books. (*See* Compl. ¶¶ 52–57.) Since, as noted above, Nance has come forward with no evidence that the publisher rejected the

manuscript in bad faith, this claim must also fail.

■ Nance's fraud claim also fails as a matter of law because it is qualitatively equivalent to his breach of contract claim. Pursuant to New York law, " 'a contract action cannot be converted to one for fraud merely by alleging that the contracting party did not intend to meet its contractual obligations.' " *International Cabletel, Inc. v. Le Groupe Videotron Ltee,* 978 F.Supp. 483, 486 (S.D.N.Y.1997) (quoting *Rocanova v. Equitable Life Assurance Soc'y,* 83 N.Y.2d 603, 614, 612 N.Y.S.2d 339, 634 N.E.2d 940 (1994)). *See also Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,* 98 F.3d 13, 19–20 (2d Cir. 1996). The essence of Nance's fraud claim is that the defendants never intended to consider his manuscript in good faith. The claim is based on the same facts as the breach of contract claim and therefore fails as a matter of law. *See Papa's–June Music, Inc. v. McLean,* 921 F.Supp. 1154, 1162 (S.D.N.Y.1996). Accordingly, defendants' motion for summary judgment dismissing Nance's fraud claim is granted.

### D. Defendants' Counterclaim

■ Since the publishers did not breach the Contract, they are entitled to summary judgment on their counterclaim for return of advances paid pursuant to the Contract. *See Maysek & Moran, Inc. v. S.G. Warburg & Co.,* 284 A.D.2d 203, 204, 726 N.Y.S.2d 546 (1st Dep't 2001) (noting that "on a motion for summary judgment, the construction of an unambiguous contract is a question of law for the court to pass on"). Clause 3(b)(ii) of the Contract provides:

> If the manuscript for Work # 2 is rejected, the Author shall retain fifty percent (50%) of monies previously advanced for Work # 2 and all other monies paid to the Author for Work # 2 shall be returned to Publisher, and Publisher shall not be obligated make any further pay-

> ments hereunder for that Work. *Thereafter, the Author may grant the rights to Work # 2 to another publisher, subject to the Author's obligation to repay Publisher the retained sum out of first and all monies received from such other publisher for Work # 2.* Further, in the event of rejection of Work # 2, Publisher may, at its option, terminate this Agreement for Work # 3 as well, and the Author shall repay Publisher all sums theretofore advanced for Work # 3.

(emphasis added.) It is uncontested that, of the total amount Nance received from defendants, $250,000 represents advances for *Blackout* and $100,000 represents an advance for Work # 3. (Compl. ¶ 48; Kovner Aff. ¶ 7.) Since Nance received an advance of $550,000 from Putnam for *Blackout,* he is obligated to repay the $250,000 advance defendants paid for *Blackout* as well as the $100,000 advance for Work # 3, less the $15,000 he has already returned.

### CONCLUSION

Because Nance has not identified any evidence from which a trier of fact could conclude that the publishers rejected his *Blackout* manuscript in bad faith, defendants' motion for summary judgment dismissing the complaint is granted. Because the publishers were entitled to terminate the Contract on the basis of a manuscript that they found unsatisfactory, summary judgment is granted to defendants on their counterclaim for the return of $335,000 in advances paid to Nance.