**HARCOURT BRACE JOVANOVICH, INC., Plaintiff,**

v.

**Barry GOLDWATER and Stephen Shadegg, Defendants.**

**No. 79 Civ. 4863.**

United States District Court, S. D. New York.

Feb. 5, 1982.

Linden & Deutsch, by Joseph Calderon, Richard A. Whitney, New York City, for plaintiff.

Treon, Warnicke & Roush, P. A., by Charles D. Roush, John B. Shadegg, Phoenix, Ariz., for defendants.

OPINION

GRIESA, District Judge.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

I wish to thank both lawyers for their arguments and for their presentation. They were very efficient and cooperative in the trial and the issues have been fully aired.

I would like to dictate findings of fact and conclusions of law now on the basic issue of liability; that is, on the question of whether or not plaintiff, Harcourt Brace Jovanovich is entitled to rely upon the provision of its contract which has been discussed so much to the effect that the author is obligated to deliver a manuscript satisfactory to the publisher in form and content.

As we all know, if it can be concluded that the manuscript here was not satisfactory to the publisher in form and content, and if it can be concluded that there was no breach of obligation by the publisher, then the publisher had the right to terminate the contract and to obtain the return of the advance which had been paid.

I want to, as I say, dictate findings of fact and conclusions of law on the issues I have just mentioned and we will subsequently determine whether there are any other issues which need to be further discussed.

This is a lawsuit by Harcourt Brace Jovanovich, Inc., a publishing house, against Barry Goldwater and Stephen Shadegg. The case has been tried to the Court without a jury and consequently I am making

findings of fact and conclusions of law now. The facts are as follows, and I so find them.

In early 1977 a proposal was submitted to Harcourt Brace Jovanovich, which I will refer to hereafter as HBJ, for the publication of the memoirs of Barry Goldwater.

The proposal was to have Stephen Shadegg act as the actual writer, working closely with Goldwater who was to provide the material and work and comment on the substance of what was presented.

Shadegg had previously had a long relationship with a literary agent by the name of Oscar Collier and he relied on Collier to market this proposal. Oscar Collier was associated as a literary agent with his daughter, Lisa Collier.

The Collier firm submitted the proposal to certain publishers, including HBJ, in early 1977. An editor at HBJ by the name of Carol Hill received the proposal. She talked about it to her editor-in-chief, Daniel Okrent. There was a meeting involving Hill, Okrent and the Colliers. The HBJ people were very enthusiastic and quickly agreed to publish the Goldwater memoirs on the basis of the proposal which had been submitted.

There is testimony demonstrating that although the HBJ people were enthusiastic about having the Goldwater memoirs, they had reservations about the writer Shadegg. There is a dispute as to whether they communicated these reservations to the Colliers. Whether they did or did not communicate the reservations is unimportant. But it is important to note that the HBJ people did have reservations and would have preferred another writer.

However, it is also to be noted that the Colliers furnished the HBJ people with four books previously written by Shadegg, a writer of long experience, who had engaged in journalistic writing as well as having written books, political biographies and so forth. The HBJ people were fully on notice as to exactly the degree of talent possessed by Shadegg.

There was a meeting in Washington, D. C., the main purpose of which was to meet Senator Goldwater. The contract was then signed January 26, 1977. It names Stephen Shadegg and Barry Goldwater as the authors and HBJ as the publisher.

The contract contains the normal provisions about royalties and many other detailed provisions not relevant here. It contains certain paragraphs referring to the concept of the manuscript being "satisfactory to the publisher in form and content," particularly paragraph 2 which states as follows:

"The author will deliver to the publisher on or before October 1, 1978, one copy of the manuscript of the work as finally revised by the author and satisfactory to the publisher in form and content."

The agreement provided for an advance totaling $200,000, a remarkably high advance. $65,000 was to be paid at the time of contract signing. Another $75,000 was due on delivery and acceptance of the completed manuscript. The balance of $60,000 was due on publication.

There was an exchange of letters in February 1977 between Hill and Goldwater in which Hill in effect offered to do a vigorous job of editing and Goldwater made it clear that he welcomed such editing. He stated in his letter of February 15, 1977 that Hill should not hesitate to criticize or make suggestions, even though he might be a little bullheaded here and there.

The project began between Shadegg and Goldwater. One of the things which was a feature of these memoirs was that Goldwater had over the years collected what he called the Alpha File. It consisted of memos and notes of conversations he had with other political and governmental leaders in the United States and he had dictated these notes and memos and prepared them at the time of various meetings and events.

These items had been collected in the Alpha File and one of the ideas of the memoirs was to publish materials of substance, anecdotes and so forth, from the Alpha File, to the extent they did not involve purely personal information or the normal kind of information which some-

times is held back until the death of certain living people in order not to hurt them.

. In any event, materials from the Alpha File were turned over to Shadegg and other materials were given to Shadegg. Goldwater commenced consulting with Shadegg and Shadegg set to work writing.

This process continued over the period of time involved in the lawsuit. Shadegg would write a section and submit it to Goldwater; Goldwater would comment, offer criticisms, provide additional material, and so forth.

On June 22, 1977, Shadegg wrote a letter to Hill enclosing a draft of seven chapters, approximately 30,000 words. At the same time Shadegg sent Oscar Collier the same draft material. The letter to Hill concluded with the following paragraph:

"We would be most interested in having your comments and your suggestions. One of the problems we face is how much to put in and how much to leave out. The available material is almost overwhelming. Your objective viewpoint will be extremely helpful."

Hill did not communicate with either Shadegg or Goldwater in response to the receipt of this draft material. This caused understandable puzzlement on the part of Shadegg and Goldwater. They were eager to have her reaction and they did not have it.

Goldwater has made it clear in his testimony in the case that he expects and needs editorial work on the part of a publisher. He has published a number of books and feels the need of editorial work. He expected it here and he was particularly puzzled that none was forthcoming.

Goldwater relied on Shadegg for the principal communications with either the publisher or the agent and, pursuant to this, Shadegg made inquiries of Oscar Collier as to what was going on. Shadegg has testified that he placed one telephone call to Hill at about this time which was not returned. He candidly admitted at trial that he did not act more persistently in going to Hill directly because he was angry and hurt at the lack of what he considered a normal response.

In any event, in September of 1977, there was a discussion between Hill and Oscar Collier. Hill gave a general unfavorable comment about the seven-chapter draft, criticizing the tone, the lack of drama and what she considered flat writing.

There is a question as to whether Oscar Collier at this point urged Hill to refrain from direct contact with the authors. Hill has testified that she was requested to refrain from such direct contact because Oscar Collier felt that her views were so inflammatory she might disrupt the project.

Oscar Collier has flatly denied that, at this time, or at any time, he urged or requested Hill to refrain from direct contact with the authors.

It is difficult to believe that Oscar Collier requested that there be no direct contact. In any event, both Goldwater and Shadegg had expressly requested Hill's editorial comments, and Collier possessed no authority to countermand these requests.

Even Hill's comments to Collier did not involve normal, detailed editorial work. They did not convey specific comments as to what should be cut or what should be added or what was unclear or any of the other things that one would expect in editorial work.

Consequently, in connection with the first seven chapters, it is clear that Hill did not perform any editorial work, either directly with the authors or indirectly through Collier.

The evidence indicates strongly that Hill was considering, and to some degree pursuing, the idea of replacing Shadegg with another writer.

In late September 1977, an item appeared in the Washington Post indicating that Goldwater was looking for a ghost writer. Goldwater and Shadegg heard about this. They inquired and were told by Hill that there was nothing to it. Hill wrote them a letter of reassurance which indicated that she was in fact enthusiastic about the book and expected that it would be an important one.

Thus, in her only direct contact with the authors at this juncture, Hill was not only withholding her negative views of the draft, she was indicating support and enthusiasm.

Behind the scenes, there were certain maneuvers going on about the possibility of getting a new writer. Apparently there was talk at HBJ on this subject, and the desire for a possible new writer was known. This resulted in some communications with a literary agent about a possible writer by the name of Clay Blair. Hill went so far as to write the agent to try to see if Clay Blair would be available. Hill did not expressly mention the Goldwater project. She spoke in veiled terms, at least to the outsiders. But the point is that a new writer for the Goldwater book was definitely on her mind.

There is in the record a document dated September 23, 1977, which is in the form of a letter from Hill to Goldwater and Shadegg making complaints about the draft material thus far received. In addition to the negative comments, this document contains a suggestion about a possible third person coming in to assist in the writing. This letter was not sent. The probable reason is that the letter was drafted at about the time that the item appeared in the Washington Post and apparently the plans about the approach to Goldwater and Shadegg about a new writer were thrown awry.

As I have already described, Oscar Collier had received from Hill some general negative comments, which he conveyed to Shadegg and which were in turn conveyed to Goldwater.

There is a letter dated November 14, 1977 to Hill from Lisa Collier indicating that comments had been passed on and that work was going forward.

The intention of Shadegg and Goldwater and their agents was to keep going ahead with the writing in the hopes that whatever problems there were would work out with the further production of manuscript. Obviously, the authors had an obligation under the contract to write and they continued to fulfill that obligation.

In the absence of any editorial work forthcoming from Hill, Shadegg solicited comments from Oscar Collier, who made detailed suggestions on draft material. These comments were not the substitute of editorial work from the publisher. They tended to deal with rather trivial points about precise phrasing and so forth. But at least Shadegg was soliciting what assistance he could from the agent.

On July 13, 1978, 24 chapters were sent to Hill. These were sent by Goldwater. The idea had been adopted that if Goldwater himself submitted the material there might be a better chance of getting some editorial work from Hill. Also it was hoped that the production of a substantial part of the book would encourage some progress with the publisher.

The Goldwater letter of July 13, 1978 concludes with the following:

"If you have any suggestions or would like to make some we could arrange to meet in Arizona at your convenience, in Washington or even New York. Let me know your honest opinion of what has been done so far and let me have any suggestions as soon as possible that might be incorporated in further writing."

The letter was not responded to. Hill made no attempt to communicate with Shadegg or Goldwater in order to offer the kind of opinions, suggestions, or comments which had been solicited in the Goldwater letter.

Hill has testified that she felt that the materials submitted in the 24-chapter package were poor and she was very concerned about whether the book could be successfully marketed. She asked two other editors at HBJ to read the materials. The other two editors were also negative about the contents of the 24-chapter package.

However, as I have said, there was no attempt to communicate with the authors and go over the matter in detail and see what, if anything, could be done to remedy the perceived difficulties.

Hill's communications again were with the agents, particularly with Oscar Collier. She conveyed her negative impression of the 24 chapters in a general way and, at this time, expressly suggested that another writer be brought in. This suggestion was rejected by Oscar Collier.

At this time Hill indicated to Oscar Collier that HBJ would probably not publish the book and would probably reject the manuscript.

Oscar Collier and Hill discussed seeking another publisher. It was indicated to Collier that he was free to do this and Collier, in order to cover the contingency he was faced with, and in order to ensure publication of the book, commenced inquiries about the possibility of another publisher.

However, Shadegg and Goldwater kept on working on the book to finish it and the intention still was to submit the final manuscript to HBJ pursuant to the existing contract.

It should be noted that on August 31, 1978, Hill sent a memo to the head of the firm, Mr. Jovanovich, which stated, among other things, "that the original idea was to have Taylor Branch rewrite the manuscript when it was delivered." Taylor Branch was a writer who had been favored by the HBJ people for this project if they could have chosen the writer.

The memo has significance, in indicating that there was an intention to refrain from doing editorial work with Shadegg in the hopes that another writer could come in and do the job.

On September 29, 1978, the full manuscript was submitted to HBJ. It contained revisions of materials earlier submitted and certain additional chapters. The full manuscript was submitted with a letter from Oscar Collier which attempted to explain what Collier felt were the merits of the manuscript.

There was further review by Hill and certain of her colleagues at HBJ, and submission to a free-lance manuscript reader. All took a very negative view of the manuscript. However, one suggestion by an associate editor was that the manuscript be reworked and that the authors be bargained down to a lower advance.

On August 31, 1978, HBJ wrote Oscar Collier returning the manuscript, stating that it was unacceptable, and demanding the return of the $65,000 advance.

Prior to this time neither Hill nor any other editor at HBJ had communicated directly with Shadegg or Goldwater regarding the manuscript material. No one at that firm attempted to do so. There was never any detailed comment about what should be added, what should be deleted, what was unclear, or about any other specific matters in the manuscript. There was no such comment made either directly to Shadegg or Goldwater, or indirectly through the agent, Collier.

Following the rejection of the manuscript by HBJ, there were discussions by Collier with a few other publishers. The result was that the book was brought by William Morrow & Company who agreed to pay an advance of $80,000. The same manuscript which had been rejected by HBJ was the one submitted to Morrow.

An experienced editor at Morrow by the name of Howard Cady has testified that he found the manuscript fascinating. He saw problems with it but felt that it could yield a best-selling book.

Prior to entering into any agreement with Shadegg and Goldwater, Cady went to see Shadegg in Phoenix, Arizona, where Shadegg lived to see whether he could work with Shadegg. This was in January 1979.

Cady found Shadegg thoroughly professional and cooperative. Cady had certain comments that were discussed with Shadegg at that time, and the two developed an immediate working relationship.

Over the next few weeks, after Morrow had bought the rights to the book, Cady sent off to Shadegg in Phoenix communications with detailed comments about items to cut, questions to be answered and so forth. In other words, Cady was engaging in the normal editorial activity.

Cady later went to Phoenix and again conferred with Shadegg. Shadegg had already started to return revised material. Cady found Shadegg to be satisfactory in all respects. Shadegg responded intelligently to his requests for changes and Cady has testified that Shadegg would generally improve on Cady's suggestions with his own creative efforts.

The book was ready for galley proofs in a relatively short time. It was published in the fall of 1979 by Morrow under the title "With No Apologies" and it became a best-seller.

Cady has testified that the process he went through with Shadegg was a normal editorial process. There were substantial cuts of superfluous material, which he has testified is not unusual in work on a manuscript of a book being prepared under contract. The cuts were made leaving what Cady felt was valuable narrative and commentary material.

As far as additions to the manuscript which had been submitted to Cady, he said that there was less than 1 percent of the material in the present book which was added pursuant to his requests and questions. Again Cady said this involved normal editorial effort.

We come to the conclusions of law to be drawn. It is true that under the contract which was in force here between HBJ and the authors, the publisher has a very considerable discretion as to whether to refuse a manuscript on the ground that it is unsatisfactory to the publisher in form and content.

It cannot be, however, that the publisher has absolutely unfettered license to act or not to act in any way it wishes and to accept or reject a book for any reason whatever. If this were the case, the publisher could simply make a contract and arbitrarily change its mind and that would be an illusory contract. It is no small thing for an author to enter into a contract with a publisher and be locked in with that publisher and prevented from marketing the book elsewhere.

It is clear, both as a matter of law and from the testimony in this case, that there is an implied obligation in a contract of this kind for the publisher to engage in appropriate editorial work with the author of a book. Both plaintiff's and defendants' witnesses testified to this effect, based on the custom of the trade.

It is clear that an author who is commissioned to do a work under a contract such as this generally needs editing to produce a successful book. There has been testimony by Goldwater, as I have mentioned, to the effect that he feels the need of editing work and expected it here. The letters from both Shadegg and Goldwater to the publisher indicated their desire for editorial work on the part of the publisher.

In a general way, it is clear that the editorial work which is required must consist of some reasonable degree of communication with the authors, an interchange with the authors about the specifics of what the publisher desires; about what specific faults are found; what items should be omitted or eliminated; what items should be added; what organizational defects exist, and so forth. If faults are found in the writing style, it seems elementary that there should be discussion and illustrations of what those defects of style are. All of this is necessary in order to allow the author the reasonable opportunity to perform to the satisfaction of the publisher.

If this editorial work is not done by the publisher, the result is that the author is misled and, in fact, is virtually prevented from performing under the contract.

There is no occasion in this decision to determine the full extent or the full definition of the editorial work which is required of a publisher under the contract. Here there was no editorial work. I emphasize, no editorial work. There was nothing approaching any sensible editorial activity on the part of the publisher. There were no comments of a detailed nature designed to give the authors an opportunity to remedy defects, even though such comments were specifically invited and requested.

The evidence does not indicate any desire or intention on the part of the HBJ people to edit. The evidence indicates a desire to have another writer and a lack of a bona fide commitment to abide by the contract.

As far as any qualms about having Shadegg as writer, it should be emphasized that the contract was with Shadegg as well as with Goldwater. The contract was not with Goldwater alone. And, as I have already indicated, the publisher entered into this contract with a full opportunity to determine the exact abilities and talents of Shadegg.

In a given situation it could be that after a contract is entered into of the kind we have here, and after draft material is submitted, the material is so hopeless that editorial work might be fruitless. It is difficult to imagine such a situation occurring but I suppose it is conceivable. But this was far from the case here.

I note that the publisher claims that there were no relevations of fact, no "revelatory material" as the term has been used. It is difficult to even comprehend that claim. The book as it was published is full of facts. It is full of conversations with illustrious personages. It is full of comments and judgments in detail about presidents and other public figures, presidential administrations and so forth. It is simply not true that the book had no factual material in it of a valuable nature.

It is quite clear that the bulk of the manuscript which was submitted to HBJ must have contained valuable and interesting factual material. This is not the case of a manuscript of no merit which ended up unpublished or was published in a book of clearly low-grade quality.

A distinguished editor, Howard Cady, found the manuscript fascinating. He edited the manuscript in the normal way and produced a successful book.

Consequently, I conclude that HBJ breached its contract with Shadegg and Goldwater by wilfully failing to engage in any rudimentary editorial work or effort. Consequently, HBJ cannot rely on the con-

cept that the manuscript was unsatisfactory in form and content and can be rejected. HBJ had no right under its contract to reject that manuscript.

I have examined the legal authorities cited by the parties. No case directly in point has been referred to. I would note particularly that the case most heavily relied upon by HBJ, *Random House, Inc. v. Gold*, 464 F.Supp. 1306 (S.D.N.Y.), aff'd mem., 607 F.2d 998 (2d Cir. 1979), holds that the type of contract involved in the present case requires the publisher to act in good faith, and notes the obvious point that, allowing unfettered license to publishers to reject a manuscript submitted under contract would permit "overreaching by publishers attempting to extricate themselves from bad deals." 464 F.Supp. at 1308 n.1. In the present case, for the reasons already stated, it must be concluded that HBJ did not act in good faith.

This concludes my findings on the issues I have set out to deal with.