Mark HELPRIN, Plaintiff,

v.

HARCOURT, INC. and Harcourt Brace
Jovanovich, Inc., Defendants.

No. 03 Civ. 1885(VM).

United States District Court,
S.D. New York.

Aug. 13, 2003.

John P. Madden, Jr., Moses & Singer, New York City, for Plaintiff.

## DECISION AND ORDER

MARRERO, District Judge.

Plaintiff Mark Helprin ("Helprin") filed a complaint (the "Complaint") against Defendants Harcourt Brace Jovanovich, Inc. ("HBJ") and Harcourt, Inc. (together with HBJ, "Harcourt"),[1] alleging that Harcourt committed fraud by making certain misstatements and concealing its failure to fulfill certain obligations pursuant to a publishing agreement between Helprin and Harcourt (the "Agreement") and breached the Agreement by (i) failing to publish Helprin's second work produced pursuant to the Agreement, (ii) improperly accounting for interest that accrued on the unrecouped portion of the advance paid to Helprin under the Agreement (the "Excluded Claim"), and (iii) failing to expend the required amounts for promotion of Helprin's first work produced pursuant to the Agreement. Harcourt in turn filed a motion (the "Motion") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the Complaint in its entirety with the exception of the Excluded Claim. For the reasons discussed below, the Motion is GRANTED IN PART and DENIED IN PART.

## I. FACTS

At its heart, the instant case is more than a dispute between two parties over the interpretation of a contract. It is "a dispute over creativity and the respective responsibilities of an author and his publisher." *Doubleday & Co., Inc. v. Curtis,* 599 F.Supp. 779, 780 (S.D.N.Y.1984). Yet, despite the disagreement that brings the parties before the Court, certain facts are undisputed.

Both parties acknowledge that Helprin is a world-famous, talented author whose previous works have earned both commercial and critical acclaim. In addition, both parties agree that in 1989, Helprin and Harcourt entered into the Agreement, which obligated Helprin to produce five works (the "Works") over an indefinite time period in exchange for, among other things, a $2,000,000 advance (the "Advance") and royalties from sales of the Works. In conjunction with the signing of the Agreement, Harcourt purchased a $2,000,000 insurance policy (the "Policy") on Helprin's life to protect Harcourt in the event that Helprin died before he was able to fulfill his obligations under the Agreement. Finally, both parties concur that in 1995, Harcourt published the first Work by Helprin under the Agreement, entitled *Memoir from Antproof Case* (the "First Work"), and Helprin did not submit a draft of his next Work (the "Contested Work") until October 24, 2002. Past those points of agreement lie the contested issues of the instant litigation.

In the Complaint, Helprin alleges he received no response to his submission of the Contested Work until December 17, 2002, when Dan Farley, president of Harcourt, informed Helprin via letter that

[1]. In 1992, HBJ was sold to General Cinema, which allegedly integrated HBJ into General Cinema's corporate structure by incorporating Harcourt General, Inc. ("HGI") as the parent company of Harcourt, Inc. and HBJ. In July, 2001, Reed Elsevier Group plc acquired HGI via a stock tender offer. According to the Complaint, HBJ was never officially dissolved under New York State law, and maintains its principal place of business in Orlando, Florida. For purposes of clarity, the Court will refer to all of these entities that served the role as Helprin's publisher as Harcourt, regardless of the actual corporate name of the publisher at the time of its actions.

Harcourt was rejecting the Contested Work for publication because it was "unacceptable as defined in paragraph 16 of the Agreement." (Complaint, attached as Exh. A to Notice of Motion, dated April 25, 2003 ("Notice of Motion"), at ¶ 26.) In the Agreement, the standard for determining what constitutes an "acceptable" Work is described as follows:

A Work shall be "acceptable" under this Agreement if such Work meets a standard comparable to the literary merit of [Helprin's] previous works.

(Agreement, attached as Exh. B to Notice of Motion, at ¶ 16(a).)

The Agreement further stated that in the event Harcourt did reject a Work because it was not acceptable, Helprin would regain all rights with respect to such Work upon notice of the rejection. Helprin then would be obligated to use his best efforts to sell the Work to another publisher, and some of the payments he received from such a deal would first go to Harcourt to reimburse it for certain portions of the Advance that went unrecouped because of the rejection.

Helprin alleges that Harcourt's rejection of the Contested Work was a breach of contract motivated by Harcourt's belief that the Contested Work would not be commercially successful and by Harcourt's desire to avoid spending money on advertising and promoting the Contested Work. Helprin also alleges that Harcourt breached the Agreement by failing to make promotional expenditures for the First Work as required under the Agreement, which states:

[Harcourt] agrees to allocate a budget of not less than one hundred thousand dollars ($100,000.00) per Work to be used at [Harcourt's] discretion for out-of-house advertising and promotion with respect to first hardcover publication of each Work in the United States, includ-

ing the costs of [Harcourt's] reimbursement of cooperative advertising expenditures of its wholesalers or dealers.

(*Id.* at ¶ 30.) Moreover, Helprin alleges that Harcourt made intentional misstatements in an effort to conceal this failure to expend the required promotional amounts, thus committing fraud.

## II. DISCUSSION

### A. STANDARD OF REVIEW

Dismissal of a complaint for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) is proper only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Harris v. City of New York*, 186 F.3d 243, 247 (2d Cir.1999). On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), a court accepts all well-pleaded factual assertions in the complaint as true and draws all reasonable inferences in favor of the plaintiff. *See Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *see also McGinty v. State of New York*, 193 F.3d 64, 68 (2d Cir.1999).

While the court may not consider matters outside the pleadings, *see Tewksbury v. Ottaway Newspapers*, 192 F.3d 322, 325 n. 1 (2d Cir.1999), it may consider documents attached as an exhibit to the Complaint or incorporated by reference, *see* Fed.R.Civ.P. 10(c); *Thomas v. Westchester County Health Care Corp.*, 232 F.Supp.2d 273, 275 (S.D.N.Y.2002), documents that are "integral" to plaintiff's claims, even if not explicitly incorporated by reference, *see Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 46–48 (2d Cir.1991), *cert. denied*, 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992), and matters of which judicial notice may be taken. *See Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir.1991). To be incorporated by ref-

erence, the Complaint must make a clear, definite and substantial reference to the documents. *See B.V. Optische Industrie de Oude Delft v. Hologic, Inc.*, 909 F.Supp. 162, 167 (S.D.N.Y.1995) ("[T]he Court concludes that a clear and definite reference to extraneous submissions not attached to the complaint is necessary for a plaintiff to assure their consideration in a motion to dismiss.").

■ In the instant case, Helprin did not attach the Agreement as an exhibit to his Complaint, so it would not be warranted to consider the document on that ground. However, the Complaint makes several substantial references to the Agreement, even quoting certain paragraphs of the Agreement verbatim. Indeed, the Complaint is based mainly on interpreting specific terms of the Agreement, and consequently, the Court will consider the Agreement as a part of the Complaint.

## B. *BREACH OF CONTRACT CLAIM BASED ON REJECTION OF THE CONTESTED WORK*

Helprin's first claim for relief alleges that Harcourt breached the Agreement when it rejected the Contested Work. Harcourt responds that paragraph 8 of the Agreement prevents Helprin from instigating a lawsuit because it provides that

[i]f a Work is not published within the time provided in Paragraph 6 . . . [Helprin] may thereafter request [Harcourt] by written notice . . . to publish such Work within six months after [Harcourt's] receipt of [Helprin's] request. If, after receipt of such notice, [Harcourt] fails to publish such Work within such period, this Agreement will terminate with respect to such Work immediately and automatically at the end of such period, all rights to such Work will revert to [Helprin] on the effective date of termination without further obligation or

liability on the part of [Harcourt], and [Helprin] will have the right to retain any advances previously paid, *but will be entitled to no other compensation, remedy, or damages*, and [Helprin] will retain the right to sell such Work to another publisher and retain the proceeds. [Harcourt's] failure to publish a Work that it has accepted according to the provisions of paragraphs 16 and 17 hereof will not alter the conditions under which [Helprin] is deemed to have satisfied his obligation in regard to such Work.

(Agreement, *supra*, at ¶ 8) (emphasis added). Paragraph 6 requires that "[w]ithin eighteen months after delivery and acceptance of the final revised manuscript of a Work hereunder, [Harcourt] will publish such Work at its own expense," (*id.* at ¶ 6), and Harcourt contends that the Contested Work is an acceptable Work for purposes of paragraphs 6 and 8—despite Harcout's rejection of it—because "Helprin has pleaded [in the Complaint] that [the Contested Work] met the standards of paragraph 16(a) and therefore under that paragraph's express terms it is deemed to be accepted by Harcourt." (Defendants' Reply Memorandum of Law, dated May 19, 2003, at 3.)

### 1. *What Constitutes an "Acceptable" Work?*

■ Harcourt's argument raises the crucial question at the heart of Helprin's claim: what constitutes an "acceptable" work under the Agreement? To answer that question, the Court first looks at paragraph 16(a) of the Agreement, which states as follows:

[Harcourt] recognizes its obligation to give editorial assistance to [Helprin] in order to assist [him] in making the manuscript of each Work hereunder acceptable for publication by [Harcourt].

However, [Harcourt] reserves the right to determine the amount and usefulness of its editorial assistance and whether or not its editorial intervention will result in an acceptable manuscript that merits publication by [Harcourt]. A Work shall be "acceptable" under this Agreement if such Work meets a standard comparable to the literary merit of [Helprin's] previous works. When the manuscript of a Work meets the foregoing standard, [Harcourt] shall notify [Helprin] of its acceptance thereof in accordance with paragraph 17 hereof. [Helprin] recognizes [his] obligation to deliver manuscripts that are complete and acceptable in accordance herewith and to participate in the editorial process for that purpose.[2]

(Agreement, *supra,* at ¶ 16(a).) Helprin contends that this paragraph was drafted in a way that "substantially alter[ed Harcourt's] discretion in accepting or rejecting a manuscript." (Complaint, *supra,* at ¶ 12.) However, in reviewing other cases before this Court involving similar contractual obligations,[3] the Court reaches a different conclusion.

In prior cases with analogous fact patterns, the publishing agreements at issue have allowed the publisher to terminate the contract if, in the publisher's sole discretion, it deemed the submitted manuscript to be unsatisfactory. *See Doubleday & Co. v. Curtis,* 763 F.2d 495, 497 (2d Cir.1985) (contract could be terminated if delivered manuscript was not "satisfactory to Publisher in content and form."); *Ran-*

*dom House, Inc. v. Gold,* 464 F.Supp. 1306, 1307 (S.D.N.Y.), *aff'd,* 607 F.2d 998 (2d Cir.1979) (same); *Nance v. Random House, Inc.,* 212 F.Supp.2d 268, 272 (S.D.N.Y.2002) (author's "manuscripts had to be 'complete and satisfactory to [the] Publisher,' and . . . publishers could reject a manuscript if they found it 'unacceptable for any reason.' ") (citations omitted); *Random House, Inc. v. Curry,* 747 F.Supp. 191, 193 (S.D.N.Y.1990) (contract could be terminated "if any manuscript that is delivered is not, in the Publisher's judgment, satisfactory . . ."); *Dell Publishing Co., Inc. v. Whedon,* 577 F.Supp. 1459, 1460 (S.D.N.Y.1984) (author had to return advances if delivered work was not satisfactory to publisher "in form, style and content"); *Harcourt Brace Jovanovich, Inc. v. Goldwater,* 532 F.Supp. 619, 620 (S.D.N.Y.1982) (author required to deliver to publisher a work "satisfactory to the publisher in form and content."); *see also Chodos v. West Publishing Co., Inc.,* 292 F.3d 992, 997 (9th Cir.2002) (publisher could terminate agreement if publisher deemed work or portion thereof unacceptable and author did not cure such identified problems within thirty days of notice of such problems). Despite Helprin's contention, the Court finds the portion of paragraph 16(a) set forth above to endow the publisher in this action with the same type of discretion as that conferred by similar contract language employed in the previously cited cases. In a contractual relationship such as this one, it would be illogical for the acceptability of the Work

**2.** A handwritten footnote to paragraph 16(a)—which appears to be initialed by both signatories to the Agreement, Helprin and Peter Jovanovich, and which neither party contests as being inaccurate—provides that "[t]he final shape of the manuscript will be determined according to the author's sole discretion."

**3.** With New York City's reputation as a publishing mecca, it is perhaps unsurprising that one can find several opinions addressing similar fact patterns in the precedents of this Court. It is surprising, however, that none of these cases are actually cited by either party in their briefs on the Motion. Despite this omission, the Court proceeds to conduct its own review of applicable precedent.

for publication to be ultimately judged by the author. If that were the case, Helprin could submit any writing to Harcourt, regardless of its coherence, artistic merit, or state of completion, and unilaterally declare it to be an acceptable work comparable to the literary merit of his previous works. Since the Agreement does not provide for an outside individual or panel to judge the quality of the submitted Work, the decision as to whether the Work is an "acceptable manuscript that merits publication by [Harcourt]" must logically fall in the final analysis to the only other party to the Agreement, namely the publisher, Harcourt. (Agreement, *supra*, at ¶ 16(a).)

Such a conclusion is bolstered by a closer reading of paragraph 16(a) as a whole. The first sentence notes that Harcourt is obligated to provide editorial assistance to Helprin in order to help make the Work "acceptable for publication *by [Harcourt]*." (Agreement, *supra*, at ¶ 16(a) (emphasis added)). Through this clause, Harcourt acknowledged that it would need to participate in the revision process to ensure that the Work would satisfy its own standard of acceptability for publication.

Later in the paragraph, in the sentence immediately following the definition of "acceptable," Harcourt makes it a condition precedent that the submitted Work satisfy the standard of acceptability before Harcourt will notify Helprin that Harcourt accepts the submitted Work for publication. (*See* Agreement, *supra*, at ¶ 16(a)) ("When the manuscript of a Work meets the foregoing standard, [Harcourt] shall notify [Helprin] of its acceptance thereof in accordance with paragraph 17 hereof.") This same sentence makes reference to paragraph 17 in defining how notification

should be made. Paragraph 17, entitled Notice of Acceptance or Termination, reads:

> Termination of this Agreement and *acceptance by [Harcourt] of a finally revised manuscript* shall be made only by a specific written notice signed by an Officer of [Harcourt]. Editorial comments concerning the intent or execution of a Work, approvals of parts of the manuscript, acknowledgment of the physical receipt of a manuscript, requests for changes, and other matters in communications to [Helprin] will not constitute acceptance or conditional acceptance *by [Harcourt]*.[4]

(*Id.*, at ¶ 17) (emphasis added). Thus, as the underscored terms unequivocally provide, the ultimate acceptance of a "finally" edited work is to be given "by [Harcourt]." In order for Harcourt to accept a submitted Work, it has to execute a written notice signed by an officer of the company explicitly stating *Harcourt's* acceptance of the Work. The second sentence's clarification that certain preliminary editorial comments and other communications to Helprin that do not explicitly express Harcourt's acceptance "do not constitute acceptance" demonstrates the intent of the parties to make clear that, as a condition precedent, Harcourt had to determine to unequivocally accept the Work in order for the acceptance to qualify under the Agreement's definition. *Id.*

Another manifestation of this intent is contained in paragraph 16(c), discussed below, governing the procedure to be followed in the event Harcourt does determine that a manuscript of the Work "*is not acceptable to [Harcourt].*" *Id.*, at ¶ 16(c) (emphasis added). As a result, for Harcourt now to contend in its response to

---

**4.** Because the paragraph is titled "Notice of Acceptance *or* Termination," the Court assumes that the first sentence should have read, or at least be interpreted as saying: "Termination of this Agreement *or* acceptance by [Harcourt]...."

Helprin's allegations that paragraph 8 is relevant because Helprin has pleaded that the Contested Work is acceptable invokes a form of circular reasoning that the Court rejects. A contract provision cannot be read to have been fulfilled simply because, in a pleading and without more, one party says so. The claim at issue does not involve Helprin's view of the quality of the Contested Work—which would most likely be favorably biased—but rather Harcourt's assertion in its letter dated December 17, 2002 that the Contested Work was not acceptable. Consequently, paragraphs 6 and 8 are inapplicable to the factual situation as Helprin has pleaded it.

### 2. *Harcourt's Good Faith*

■ Having rejected both Helprin's contention that the acceptability clause is distinct from other such clauses in the publishing industry and Harcourt's assertion that paragraphs 6 and 8 should govern the situation presented here, the Court turns to paragraph 16(c), which contemplates a prospect identical to the factual situation at hand:

> In the event that [Harcourt] determines in accordance with this Agreement that the manuscript of a Work is not acceptable to it, it shall so notify [Helprin] and upon such notice all rights with respect to such Work granted or transferred to [Harcourt] under this Agreement will automatically revert to [Helprin].

(Agreement, *supra*, at ¶ 16(c).) The paragraph continues by stating that upon such rejection, Helprin is obligated to use his best efforts to sell the Work to another publisher and, if successful, return some of the profits from that sale to Harcourt so Harcourt could recoup the portion of the Advance that applied to the Contested Work. In light of paragraph 16(c), Harcourt might be inclined to argue that it is under no obligation to publish a submis-

sion that it finds unacceptable. Harcourt does not make such an argument, perhaps in part because of the existence of a significant body of precedent in this Court that directly addresses when a publisher is permitted to reject a submitted work from an author who is under contract with that publisher.

In at least six cases in recent years with similar fact patterns to the instant case, the Court has interpreted comparable "acceptability" clauses as granting publishers wide discretion to terminate publishing contracts if the submitted draft is not acceptable, "provided that the termination is made in good faith, and that the failure of the author to submit a satisfactory manuscript was not caused by the publisher's bad faith." *Curtis*, 763 F.2d at 501; *see also Gold*, 464 F.Supp. at 1308; *Nance*, 212 F.Supp.2d at 272; *Curry*, 747 F.Supp. at 193; *Whedon*, 577 F.Supp. at 1462; *Goldwater*, 532 F.Supp. at 624. The Court reached these holdings based in part on analogous breach of contract cases considered by New York courts where the satisfactory performance of one party was to be judged by another party. In such cases, the New York courts required the party terminating the contract to act in good faith.

In *Curtis*, for example, the Court observed that:

> [t]his principle—that a contract containing a "satisfaction clause" may be terminated only as a result of honest dissatisfaction—would seem especially appropriate in construing publishing agreements. To shield from scrutiny the already chimerical process of evaluating literary value would render the "satisfaction" clause an illusory promise, and place authors at the unbridled mercy of their editors.

763 F.2d at 500; *see also Goldwater*, 532 F.Supp. at 624 ("It cannot be, however,

that the publisher has absolutely unfettered license to act or not to act in any way it wishes and to accept or reject a book for any reason whatever. If this were the case, the publisher could simply make a contract and arbitrarily change its mind and that would be an illusory contract."). Furthermore, testimony at some of the Court's cases established that publishing industry practice has always involved "significant editorial changes, and that it is 'inconceivable' ... that a publisher would reject a completed manuscript written under contract, without first offering or providing some editorial assistance to revise it." *Whedon,* 577 F.Supp. at 1463 n. 4; *see also Goldwater,* 532 F.Supp. at 624 (observing that both parties' witnesses testified that the "custom of the trade" establishes an implied good faith obligation on the part of a publisher to engage in appropriate editorial work with the author).

Thus, in determining whether the publisher in each of the foregoing cases acted in good faith, the Court focused primarily on the amount of editorial assistance the publisher provided. A publisher that provided a "detailed and lengthy editorial analysis of the shortcomings in the plot, characters and pacing of the submitted draft" demonstrated its good faith in offering sufficient editorial assistance. *Nance,* 212 F.Supp.2d at 273; *see also Curtis,* 763 F.2d at 498, 501 (finding that publisher's thorough review and offers of subsequent help demonstrated good faith); *Gold,* 464 F.Supp. at 1307–10 (finding that publisher's editorial comments and assistance demonstrated good faith). A publisher that did "nothing approaching any [kind of] sensible editorial activity" and failed to provide any "comments of a detailed nature designed to give the author[ ] an opportunity to remedy defects" failed the test and could be considered in possible breach of its agreement. *Goldwater,* 532

F.Supp. at 624; *Whedon,* 577 F.Supp. at 1462–63 (concluding that publisher did not act in good faith when calling manuscript unsatisfactory because it did not offer "detailed explication of the problems it saw in the manuscript, and an opportunity to revise [the manuscript] along the lines its editors suggested.").

Based on the Complaint, the Court finds that Helprin has pled sufficient facts to state a sufficient claim at this point in the litigation that Harcourt did not act in good faith when judging the Contested Work unacceptable. Helprin alleges that he sent the Contested Work to Harcourt, and less than two months later received a letter back saying only that the Contested Work was being rejected because it was unacceptable as defined in paragraph 16 of the Agreement. There is no indication at this stage from either party that Harcourt offered any further editorial comments or assistance, nor has it been alleged by either party that Harcourt allowed Helprin an opportunity to cure whatever defects Harcourt found in the Contested Work. As a result, the Court finds that Helprin has met his burden to state a claim with regard to breach of contract based on rejection of the Contested Work.

## C. *FRAUD CLAIM*

Helprin's third claim for relief alleges that Harcourt made intentional misstatements to and concealed from Helprin its failure to expend the amounts required by the Agreement for the promotion of the first American hardcover edition of the First Work, thus committing fraud. Harcourt responds that the fraud claim should be dismissed because it is duplicative of Helprin's breach of contract claim. The Court agrees.

It is well-established, both under New York law and this Court's precedents,

that a plaintiff cannot sustain a cause of action for fraud where the only fraud alleged consists of the breach of a contract between the parties, and such allegations "do not concern representations which are collateral or extraneous to the terms of the parties' agreement...." *Shred–It USA, Inc. v. Mobile Data Shred, Inc.,* 228 F.Supp.2d 455, 463–64 (S.D.N.Y.2002); *see also Glynwill Investments, N.V. v. Prudential Securities, Inc.,* 1995 WL 362500, No. 92 Civ. 9267, at \*7 (S.D.N.Y. June 16, 1995). Thus, "in order to state a claim for fraud separate from a breach of contract, plaintiff must allege the breach of a legal duty which exists independent of the contract." *Glynwill,* 1995 WL 362500, at \*7. "Where the fraudulent conduct alleged amounts only to the defendant's false representation that it was adhering to the terms of the contract, the claim for fraud must be dismissed as redundant of the breach of contract claim." *Id.*

In the instant case, Helprin's allegations of fraud concern only Harcourt's alleged misstatements about and concealments of the fraud it was supposedly perpetrating when it purportedly failed to expend the amounts for promotion required by the Agreement. Since there is no legal duty independent of the Agreement which Helprin alleges was breached, and because the alleged fraudulent conduct consists only of purported false representations regarding Harcourt's adherence to the terms of the Agreement, the Court finds that such allegations cannot support a separate fraud claim.

## D. *BREACH OF CONTRACT CLAIM BASED ON FAILURE TO EXPEND REQUIRED PROMOTIONAL AMOUNTS*

Helprin's fourth claim for relief relates to his third claim. Helprin alleges that Harcourt breached the Agreement by not expending the required amounts for the promotion of the first hardcover edition of the First Work. Harcourt responds that Helprin's breach of contract claim is barred by New York's six-year statute of limitations because the alleged breach of the Agreement occurred in 1995 when Harcourt purportedly failed to expend all of the agreed-upon sums to promote the First Work.

Harcourt's defense raises several issues, some of which are not addressed by either party. First, does the language of the Agreement's promotion paragraph actually create a definitive contractual obligation for Harcourt to spend the entire promotional budget for the First Work (the "Budget")? Paragraph 30 states that, with regard to out-of-house advertising and promotion for the American hardcover edition of each Work, Harcourt "agrees to *allocate* a budget of not less than one hundred thousand dollars ($100,000.00) per Work to be used at [*Harcourt's*] *discretion* ...." (Agreement, *supra,* at ¶ 30) (emphasis added). The Agreement's use of the verb "allocate"—which Miriam–Webster's Dictionary defines as "apportion[ing] for a specific purpose or to particular persons or things," *Miriam–Webster's Collegiate Dictionary* 30 (10th ed.1993)—implies that, while Harcourt is obligated to reserve or earmark a minimum amount for promotion, it is not necessarily required to fully *spend* the money. Indeed, use of the Budget is left completely to Harcourt's discretion and the provision specifies no time frame in which Harcourt is required to spend the entire Budget.

Moreover, Harcourt is not obligated to account for the Budget, as it is required to do with respect to Helprin's royalties, nor is Helprin given any right to request an audit of the Budget, as he is allowed to with regard to his royalties. Such circumstances lend support to the interpretation

that the Agreement intended to provide Harcourt free reign in utilizing what Helprin himself alleged "was substantially in excess of the average [promotional budget] in the publishing industry in June 1995, and ... more than the average for Harcourt at that time as well." (Complaint, *supra*, at ¶ 35.) However, while Helprin's claim that Harcourt breached the Agreement by not spending the full amount may not be sufficient to state a claim, neither party raises the issue of the interpretation of the promotional paragraph in their briefs on the Motion. Consequently, the Court is not inclined to dismiss the claim out of hand without the benefit of the parties' briefing of the matter.

■ The interpretation problem described above raises another concern, even if the paragraph were interpreted as requiring Harcourt to spend the Budget: at what point was Harcourt determined to be in breach of the Agreement? Under New York law, once a contract is breached, the aggrieved party has six years to file a claim before the statute of limitations expires. *See N.Y. Civ. Prac. Law* § 213 (McKinney 2003); *T & N PLC v. Fred S. James & Co. of New York, Inc.*, 29 F.3d 57, 59 (2d Cir.1994). Because paragraph 30 does not provide a date by which Harcourt was obligated to have fully spent the Budget, the Court needs, at the very least, more information on the typical length of time necessary, under prevailing industry practice or the parties' prior course of dealings, to spend a promotional budget for a hardcover book by a writer of Helprin's stature in order to assess at what point the breach occurred and the statute of limitations commenced to run. Such an estimated time frame would also need to take into account the unusually large size of the Budget as compared to other standard promotional budgets, since the larger sized Budget could lengthen the time

needed to fully spend it. Neither party has presented such information, and without such knowledge, the Court has insufficient factual basis to ascertain when the statute of limitations began to run.

■ Even if the Court could determine the exact date of the breach, Helprin has argued that Harcourt is equitably estopped from asserting the statute of limitations as a defense because Helprin was prevented from learning about Harcourt's breach as a result of Harcourt's misrepresentations and concealments. The Court first notes that the doctrine of equitable estoppel is properly invoked only in cases "where the plaintiff knew of the existence of his cause of action but the defendant's conduct caused him to delay in bringing his lawsuit." *Cerbone v. International Ladies' Garment Workers' Union*, 768 F.2d 45, 49–50 (2d Cir.1985) (offering as examples "cases where the defendant misrepresented the length of the limitations period or in some way lulled the plaintiff into believing that it was not necessary for him to commence litigation."). Helprin has not alleged that Harcourt caused him to delay in bringing suit on a known cause of action. Instead, Helprin claims that he did not discover the alleged breach until after the statute of limitations expired. Thus, equitable estoppel is not appropriate in this case. *See Moll v. U.S. Life Title Ins. Co. of New York*, 700 F.Supp. 1284, 1293 (S.D.N.Y.1988).

■ Conceivably, Helprin meant instead to invoke the doctrine of equitable tolling, under which a plaintiff may be unaware of the existence and accrual of his cause of action because of the defendant's fraudulent concealment. *See Cerbone*, 768 F.2d at 49–50. To invoke the doctrine of equitable tolling and overcome Harcourt's assertion that the claim is time-barred, Helprin must plead the following: "(1) wrongful concealment by defendants, (2) which pre-

vented plaintiff['s] discovery of the claim, and (3) due diligence by plaintiff[ ] in pursuing discovery of the claim." *Kolbeck v. LIT America, Inc.,* 923 F.Supp. 557, 565 (S.D.N.Y.1996) (citing *Butala v. Agashiwala,* 916 F.Supp. 314, 321 (S.D.N.Y.1996)) (granting defendants' motion to dismiss plaintiff's securities fraud case). Furthermore, even if such concealment existed, Helprin must demonstrate that he "acted reasonably to discover the facts and to protect [his] rights." *Rosen ex rel. Egghead.Com, Inc. v. Brookhaven Capital Management, Co. Ltd.,* 179 F.Supp.2d 330, 337–38 (S.D.N.Y.2002).

Under Fed.R.Civ.P. 9(b), a plaintiff stating a claim of fraud or mistake must allege the "the circumstances constituting [the] fraud or mistake ... with particularity." Fed.R.Civ.P. 9(b); *see also Moll,* 700 F.Supp. at 1289 ("Fraudulent concealment claims come within the ambit of Rule 9(b).") Thus, Helprin must plead with particularity Harcourt's purported fraudulent conduct which could justify tolling the statute of limitations. While the Court need not rule on the issue of equitable tolling at this point because of the previously discussed uncertainties regarding interpretation of paragraph 30 and the exact time of the breach, the Court does note that it is unclear whether Helprin has met the Rule 9(b) burden.

Helprin alleges that in 1995 he became concerned that Harcourt had not spent the requisite amount of the Budget and questioned Rubin Pfeffer ("Pfeffer"), then-President of Harcourt, as to whether Harcourt had fulfilled its promotional obligations under the Agreement. Pfeffer allegedly responded that Harcourt had either already fulfilled such obligations or was on the way to doing so. Helprin claims this response was false, and known to be false by Pfeffer, and in fact "[u]pon information and belief, Harcourt spent substantially less than [the required amount] on promotion of the [First Work]." (Complaint, supra, at ¶ 37.) Moreover, Helprin avers that since 1995, Harcourt concealed its failure to fulfill its promotional obligations by omitting discussion of such failure in numerous communications to Helprin.

Helprin's allegations that Pfeffer knowingly lied to him are conclusory, as there is no explanation or particular facts asserted in the Complaint to suggest how Helprin knew that Pfeffer was lying. *See Moll,* 700 F.Supp. at 1289 ("Conclusory allegations of fraudulent concealment are not sufficient to withstand a motion to dismiss."). Helprin alleges that Harcourt omitted discussion of the expenditure of the Budget in numerous communications, but since there was no obligation by Harcourt to share such information with Helprin, it is difficult to assert such silence as evidence of liability.

In addition, "[p]leadings alleging fraud usually may not be based on information and belief." 2 James Wm. Moore et al., *Moore's Federal Practice* ¶ 9.03[1][g] (3d ed.2002). Exceptions can be made "if the pleader identifies the available information on which the allegation of fraud is founded, as well as the efforts made to obtain additional information." *Id.* While Helprin attempts to do this by supplementing his pleading with an Affirmation submitted with his Response Brief, the Court cannot consider such a document because it is not attached as an exhibit to the Complaint or incorporated by reference, is not an integral document to Helprin's claim, nor is it a matter of which judicial notice may be taken. *See WestPoint–Pepperell, Inc.,* 945 F.2d at 44. Thus, the Court is unable to rule on several issues involving Helprin's fourth claim, and consequently will not dismiss the claim at this time.

## E. *HELPRIN'S REQUESTED FORMS OF RELIEF*

In addition to Harcourt's opposition to Helprin's claims, Harcourt contends that some forms of relief requested by Helprin in the Complaint are improper. Specifically, among various remedies, Helprin seeks: (1) rescission of the Agreement, causing the rights to all Works written by Helprin under the Agreement to revert to him, leaving Helprin with no further obligations to Harcourt, and providing Harcourt with no further rights under the Agreement, (2) punitive damages of $10 million, and (3) a permanent injunction requiring Harcourt to assign the Policy to Helprin or his designated beneficiaries. Despite Helprin's protestations, the Court considers it appropriate to examine Harcourt's opposition at this stage of the proceeding. *See Hawthorne Partners v. AT&T Technologies, Inc.*, No. 91 Civ. 7167, 1992 WL 53684, at *3–4 (N.D.Ill. Mar. 11, 1992) (examining in motion to dismiss whether plaintiff's request for rescission and punitive damages is improper); *WICO Corp. v. Willis Ind.*, 567 F.Supp. 352, 355 (N.D.Ill.1983) (permitting argument to strike a remedy at motion to dismiss phase because "familiar pleading principles teach the prayer for relief is not part of the cause of action itself, which is a function of the *facts* alleged in the complaint").

### 1. *Rescission*

 Helprin seeks rescission of the Agreement on the ground that a material breach has occurred. "Under New York law, '[r]escission is an extraordinary remedy, appropriate only where the breach is found to be material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract.'" *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, (2d Cir.2000) (citing *Canfield v. Reyn-*

*olds*, 631 F.2d 169, 178 (2d Cir.1980)). "Courts generally permit rescission of a contract only when it appears reasonably feasible to return the parties to their respective positions prior to the contract." *See K.M.L. Laboratories Ltd. v. Hopper*, 830 F.Supp. 159, 164 (E.D.N.Y.1993) (citing *Kamerman v. Curtis*, 285 N.Y. 221, 33 N.E.2d 530 (N.Y.1941)).

 Harcourt contests Helprin's request, asserting that the alleged breach is not material, willful, substantial or fundamental, that Helprin has not offered to restore the status quo, and that he has an adequate remedy at law. The Court is not persuaded that the alleged breach is not significant enough to qualify for rescission. The test for determining the materiality of a breach for purposes of rescission is whether the alleged breach is "of such nature and such importance that the contract would not have been made without it." Richard A. Lord, *Williston on Contracts* § 68:2, at 42 (4th ed.2003). Assuming that Helprin's allegation that Harcourt rejected the Contested Work in bad faith is correct, it is fair to conclude that such a rejection could serve to undermine the entire purpose of the Agreement, which was to produce the Works for Harcourt to publish.

Harcourt's other arguments fail as well. Harcourt asserts that the right of rescission cannot be exercised without a return or an offer to return such benefits. Yet, the case Harcourt cites for this proposition clearly distinguishes between cases based upon a rescission of a voidable contract and cases where the remedy sought includes rescission. *See E.T.C. Corp. v. Title Guarantee & Trust Co.*, 271 N.Y. 124, 127, 2 N.E.2d 284 (N.Y.1936). With regard to the latter, the New York Court of Appeals has stated that it is sufficient for the offer to return the benefits to be stated in the complaint. *See id.* While Helprin did not

make such an offer in the Complaint, and in fact requested that Harcourt be declared unable to recoup any of the Advance, Helprin has also indicated his willingness to follow the Court's orders if the Court demands that he return a portion of the Advance in order to be entitled to rescission. (*See* Memorandum of Mark Helprin in Opposition to Defendants' Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(6), undated, at 10.) Because the restoration of benefits to Harcourt consists simply of returning the unrecouped portion of the Advance, and therefore is easily identifiable and performable by Helprin, the Court is not inclined to dismiss Helprin's request for rescission at this time solely based on his initial failure to offer to return the unrecouped portion of the Advance.

Finally, Harcourt asserts that Helprin's claim for breach of contract based on the rejection of the Contested Work can be adequately remedied by money damages reflecting lost royalties. This argument ignores Helprin's concerns regarding his ability to publish future Works under the Agreement and the possible lost trust between him and Harcourt that could make it difficult for a working relationship to continue in the future. If the trier of fact eventually finds these concerns have merit, money damages may not be sufficient as a remedy. Thus, at this stage of the proceeding, the Court is satisfied that Helprin's allegations on these issues demonstrate that a request for rescission should be maintained as a possible remedy should the instant case be resolved in favor of Helprin.

### 2. *Punitive Damages*

■ Helprin also seeks $10 million in punitive damages against Harcourt. Under New York law, punitive damages are not available in the ordinary breach of contract case. *See United States v. Merritt Meridian Const. Corp.*, 95 F.3d 153, 160 (2d Cir.1996). However, such damages are available if the plaintiff demonstrates, at a minimum, that the defendant's conduct was (1) actionable as an independent tort; (2) egregious in nature; and (3) directed towards plaintiff. *See Ladenburg Thalmann & Co. Inc. v. Imaging Diagnostic Sys., Inc.*, 176 F.Supp.2d 199, 207 (S.D.N.Y.2001). While some courts discussing this issue have required the plaintiff to prove that such conduct was part of a pattern directed at the public generally, this Court recently engaged in an exhaustive discussion of the matter and concluded that such an element is not always required to secure punitive damages in breach of contract actions. *See TVT Records and TVT Music, Inc. v. The Island Def Jam Music Group*, 262 F.Supp.2d 188, 194–96 (S.D.N.Y.2003) (reviewing precedent on the matter and concluding that "absent conduct directed at the public in general, punitive damages may be available in a breach of contract claim where the plaintiff establishes a sufficiently high degree of bad faith by the defendant evincing disingenuous or dishonest failure to carry out contractual obligations, thus frustrating the plaintiff's rights to an aggravated extent, particularly where bad faith is apparent at or near the outset of the transaction and where the breached obligations are unambiguous.").

■ Having dismissed Helprin's fraud claim, the Court can only consider whether punitive damages are appropriate with regard to Helprin's breach of contract claim based on rejection of the Contested Work. The Court is not persuaded that Helprin has alleged sufficient facts to sustain a claim of egregious tortuous conduct that is independent from Harcourt's alleged bad faith rejection of the Contested Work. *See Continental Info. Sys. Corp. v. Federal*

*Ins. Co.*, No. 02 Civ. 4168, 2003 WL 145561, at *3 (S.D.N.Y. Jan. 17, 2003) (finding that in order to obtain punitive damages, plaintiff must allege tortuous conduct "independent of plaintiff's claim of bad faith denial of insurance coverage"). As a result, Harcourt's motion to strike Helprin's request for punitive damages is granted.

### 3. *Insurance Policy*

Helprin also requests that the Policy be assigned to him or his designated beneficiaries, arguing that Harcourt no longer has an insurance interest in Helprin's life. In the alternative, Helprin asks for the option to cancel the Policy. Harcourt responds that the Policy was already cancelled, and even if it still existed, Harcourt maintains an insurable interest in Helprin's life.

First, with the skeletal record available here, the Court is unable to make a determination as to whether the Policy still exists, and therefore the Court declines to dismiss Helprin's request on the basis of an unsupported statement from Harcourt's briefing memorandum that the Policy has been cancelled. Moreover, without a copy of the Policy to examine, the Court cannot determine what effect a ruling as to whether or not Harcourt still has an insurable interest in Helprin's life would have on the Policy because "[a]lthough an insurable interest in another's life must exist at the inception of the policy in order to create a valid contract, that interest need not continue unless the policy so provides." *Herman v. Provident Mut. Life Ins. Co. of Philadelphia*, 886 F.2d 529, 533 (2d Cir. 1989). Thus, at this stage of the proceeding, the Court is not prepared to rule on the propriety of Helprin's request for an assignment of the Policy.

As discussed above, the Complaint contains some deficiencies that Helprin may wish to correct. Thus, Helprin is granted leave to amend his complaint.

## III. *ORDER*

For the reasons described above, it is hereby

**ORDERED** that Harcourt, Inc. and Harcourt Brace Jovanovich, Inc.'s motion to dismiss with regard to the first claim in the Complaint is DENIED; and it is further;

**ORDERED** that Harcourt, Inc. and Harcourt Brace Jovanovich, Inc.'s motion to dismiss with regard to the third claim in the Complaint is GRANTED; and it is further;

**ORDERED** that Harcourt, Inc. and Harcourt Brace Jovanovich, Inc.'s motion to dismiss with regard to the fourth claim in the Complaint is DENIED; and it is further

**ORDERED** that the claim for punitive damages in the first claim in the Complaint is stricken; and it is finally

**ORDERED** that Helprin shall have twenty (20) days from the date of this Decision and Order within which to amend the Complaint, consistent with this Decision and Order.

**SO ORDERED.**